**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA F. PATTERSON, | ) | CASE NO.  5:09-cv-1566 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |
| | ) | |

     Plaintiff, Patricia Patterson ("Patterson"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Patterson's applications for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

     For the reasons set forth below, the final decision of the Commissioner is VACATED and REMANDED.

## I. Procedural History

Patterson filed her application for SSI on October 29, 2001.  (Tr. 81-84).  Her application was denied initially and upon reconsideration.  (Tr. 62-64, 67-69).  On April 1, 2004, Patterson filed a request for a hearing.  (Tr. 70).  On July 18, 2003, Administrative Law Judge ("ALJ") K. Michael Foley held a hearing at which Patterson, who was represented by counsel, and Richard Oestreich, vocational expert ("VE") testified.  (Tr.785).  On May 24, 2004, the ALJ issued his decision in which he determined that Patterson was not disabled.  (Tr.  54-61).  Patterson objected to the ALJ's determination and filed a Request for Review.  On May 4, 2006, the Appeals Council remanded the case to the ALJ in order to consider new evidence, obtain a physical consultive examination, and if necessary, obtain medical evidence from a medical expert and/or a vocational expert.  (Tr. 77-80).

On August 8, 2007, the ALJ held a second hearing at which Patterson, who was represented by counsel, Dr. David Garling, a medical expert, and Dr. Walter Walsh, a VE,  testified.  (Tr. 815-843).  On February 19, 2008, the ALJ issued his second opinion in which he determined that Patterson was not disabled.  (Tr. 19-31).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.  Patterson filed an appeal to this Court.

On appeal, Patterson claims the ALJ erred by:  (1) determining that Patterson's fibromyalgia and mental health impairments were not severe; and (2) failing to grant substantial weight to the opinions of Patterson's treating physicians.  The Commissioner disputes these claims.

2

## II.  Evidence

### A.  Personal and Vocational Evidence

Patterson was born on September 9,1953.  (Tr. 53).  Patterson has a high school education.  She has no past relevant work experience.  (Tr. 29).

### B. Medical Evidence

Patterson treated with Dr. Albert S. Miller from September 19, 1997 through July 26, 2001 for, among other things, muscle aches and pain (Tr. 176, 187, 193, 207), fatigue/weakness (Tr. 186, 204-205, 210), and dizziness/lightheadedness (Tr. 187, 200). Diagnoses included allergies, asthma, and allergic rhinitis (Tr. 175, 177, 179, 183, 186, 187, 193, 198, 200, 201, 203, 208); osteoarthritis (Tr. 176, 179, 193, 207); fibromyalgia (Tr. 179, 183, 187, 193); and depression (177, 187, 193, 198, 201, 205, 208-209, 210).

 On May 26, 2000, Dr. Miller noted multiple tender points in the myofacial areas. (Tr. 186).  His initial diagnosis was fibromyalgia, but he noted the necessity to rule out other diagnoses.  (Tr. 186).

On June 7, 2000, Patterson presented to Dr. Miller for follow-up and to review her lab work.  Dr. Miller noted that Patterson's labs were negative for any form of connective tissue disease.  He opined that her symptoms were most consistent with fibromyalgia. (Tr. 183).

Patterson treated with Dr. Fearon from August 22, 2001 through January 8, 2003. The medical records include symptoms of back and tailbone pain (Tr. 342-344, 368), tremors (Tr. 344), dizziness (Tr. 354), fatigue (Tr. 355, 357, 368), and depression (Tr. 344, 371).  Patterson's examinations revealed muscle spasms (Tr. 341,

3

343), reproducible pain (Tr. 341, 365), tremors (Tr. 347, 353), and flared fibromyalgia points.  (Tr. 355, 365).

Diagnoses included benign essential tremors (Tr. 341, 344, 347), chronic low back pain/degenerative disc disease (Tr. 341, 343, 344, 367), myoclonus (Tr. 343, 347, 349, 352, 354), fibromyalgia (Tr. 350, 352, 357, 360, 367), depression (Tr. 344, 352, 355, 357, 360) and anxiety (Tr. 347, 352, 355, 357, 359-360).

Patterson presented to Dr. Fearon on October 15, 2001.  Patterson reported that she had been experiencing significant fibromyalgia flare-ups over the past six months which she associated with increased stress.  She reported that she could not get through some days because of her fibromyalgia, and she was fearful she would not be able to work because of her symptoms.  Physical examination revealed reproducible pain, as well as flaring of all fibromyalgia tender points.  (Tr. 365).

Patterson presented to Dr. Fearon on December 7, 2001.  Patterson reported she was still having fibromyalgia flares but the Doxepin had helped.  Physical examination revealed that all fibromyalgia tender points were flared.  (Tr. 360-361).

On December 14, 2001, Dale Campbell, DC completed a questionnaire at the request of the state agency.  (Tr. 266-270).  Dr. Campbell's examinations revealed tenderness in the cervical to lumbar area, mild lumbar swelling, moderate lumbar contracture, moderate crepitation, mild synovial thickening in the lumbar region, mild edema in the lumbar region, moderate pelvic instability, and subluxation of C2/C4/T4/left and right ilium.  (Tr. 267).  There was decreased range of motion of the cervical and lumbar regions.  (Tr. 267).  Dr. Campbell also noted a loss of fine dexterity and inability to open a jar.  (Tr. 268). Dr. Campbell opined that Patterson was: (1) only

4

able to stand and walk for a short time; (2) had limited ability to handle objects; (3) could lift and carry light weight; (4) could travel short distances; and (5) was limited in her social interaction and adaptation.  (Tr. 270).  Dr. Campbell further opined that when Patterson experienced flare ups of certain neurological conditions, she was unable to do several activities because of trembling and an inability to think correctly.  (Tr. 266-270).

On January 2, 2002,  Ryan L. Dunn, Ph. D. performed a psychological examination at the request of the state agency.  (Tr. 286-290).  Patterson reported varying physical limitations depending on her level of symptoms on any given day.  She reported taking care of her own housework, driving herself on errands (including shopping) and helping with her grandchildren.  She also reported a history of panic attacks which have significantly improved since she began taking Prozac.  Dr. Dunn concluded that Patterson had mild limitations in her ability to relate to others; and apparent limitations in her ability to understand and follow instructions, maintain attention to perform simple, repetitive tasks, and withstand the stress and pressure associated with day-to-day work activity.  Dr. Dunn diagnosed panic disorder with agoraphobia in partial remission (treated with medication) and assigned Patterson a GAF score of 65.[1]  (Tr. 286-290).

On January 14, 2002, Dr. Fearon completed a questionnaire at the request of the state agency.  Dr. Fearon stated that Patterson had pain in all fibromyalgia tender points

---

[1] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

with spasms in the trapezius, crepitus, asthma, and depression with chronic pain and situational stressors.  (Tr. 280).   Patterson's daily activities were limited due to pain and asthma.  (Tr. 280).  Heavy lifting and repetitive work were limited due to muscle fatigue and lung stress.  (Tr. 274).  Dr. Fearon opined that Ms. Patterson was unable to use a small keyboard due to shoulder pain.  (Tr. 274).  There were no limitation on sitting provided Patterson did not engage in repetitive computer work; however she could not tolerate prolonged standing, walking, bending, lifting, and carrying.  (Tr. 281).

On January 31, 2002, Steven Meyer, Ph. D. completed a mental functional capacity assessment of Patterson.  Dr. Meyer opined that Patterson was moderately limited in her ability to: (1) understand, remember, and carry-out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; and (5) respond appropriately to changes in the work setting.  (Tr. 316-317).  Dr. Meyer opined that Patterson could work at a reasonable pace, with occasional and superficial contact with others, and in a setting with routine demands and few changes.  (Tr. 318).  Dr. Meyer's report was affirmed by Bruce Goldsmith, Ph. D. on May 29, 2002.  (Tr. 318).

On February 26, 2002, the state agency requested an additional report from Dr. Fearon.  (Tr. 298).  Dr. Fearon noted that she began treating Patterson in August 2001 and had last examined her on May 13, 2002.  Dr. Fearon stated that Patterson had chronic pain with obstructive sleep apnea, fibromyalgia, and myoclonus.  (Tr. 298).  She has chronic diffuse muscle pain and chronic diffuse muscle spasm resulting from

6

fibromyalgia.  (Tr. 298).  Dr.  Fearon noted tenderness at bilateral fibromyalgia trigger points including the trapezius, back and elbow, and crepitus of the knee.  Dr. Fearon opined that Patterson's activities of daily living were limited by shortness of breath, dizziness, and chronic pain.  (Tr. 303).  She further opined that any physical activity can only be performed minimally and that constant variety is needed.  She cannot use a small keyboard for more than 30 minutes.  Dr. Fearon also noted that she is not a disability evaluation physician, and was not qualified to be completing disability forms. (Tr. 309).

On or about April 2002, Patterson's therapist, L. Ann Jones, LISW, completed a questionnaire at the request of the state agency.  Jones reported that Patterson was anxious and exhibited nervousness by hand tremors.  Jones opined that Patterson's memory is impaired possibly due to stress.  Jones noted that Patterson is more comfortable in small groups, and that the pressure associated with simple and routine tasks in the work place might increase Patterson's panic disorder.  (Tr. 291-292).

On May 23, 2002, W. Jerry McCloud, M.D., state agency reviewing physician, completed a physical residual functional capacity assessment.  (Tr. 310).  Dr. McCloud noted that Patterson's primary diagnosis was fibromyalgia and her secondary diagnosis was chronic pain.  Dr. McCloud opined that Patterson could lift 20 pounds occasionally and 10 pounds frequently; she could sit, stand, and walk for six hours out of an eight hour workday.  Patterson was limited to frequent climbing, stooping, and kneeling; she could occasionally balance, crouch, and crawl.  (Tr. 312).  She was also to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  (Tr. 313).

On July 19, 2002, Dr. Campbell completed a medical source statement.  Dr.

7

Campbell opined that Patterson was limited to lifting 5-10 pounds, and could stand/walk

for 30 minutes continuously to a total of two hours out of an eight hour work- day.  Dr.

Campbell opined that Patterson needed additional breaks due to hip pain and

weakness.  He further opined that Patterson could rarely climb, stoop, crouch, kneel,

crawl, reach, handle, push/pull, and perform fine or gross manipulation; she could

occasionally balance.  Patterson was limited in her ability to work at heights and around

moving machinery, chemicals, dust, noise, and fumes.  (Tr. 325-326).

On July 21, 2002, Dr. Fearon completed a medical source statement.  (Tr. 328-

239).  Dr. Fearon opined that Patterson was limited to lifting less than 5 pounds

occasionally due to tender points at fibromyalgia triggers in her shoulders, upper

extremities, and back, and shortness of breath and wheezes with exertion.  (Tr. 328).

Patterson was limited to standing and walking limited to 15 minutes continuously for a

total of two hours out of an eight hour workday due to tender points in Patterson's hips

and knee.  (Tr. 328).  Patterson could sit for 20 minutes continuously for a total of  two

hours out of an eight hour workday.  She could not use a keyboard.  (Tr. 328).

Patterson's ability to climb, balance, stoop, crouch, kneel, crawl, reach, and handle

were limited to a rare/none basis; she could occasionally feel or engage in fine

manipulation.  She was also limited in working at heights and around moving machinery,

temperature extremes, chemicals, dust, and fumes due to exacerbations of asthma and

because her medications did not allow for "quick reactions". (Tr. 329).  Dr. Fearon

stated that due to Patterson's fibromyalgia, she could not exhaust muscles or she would

deteriorate in pain.  (Tr. 329).

On January 2, 2003, Patterson presented to Dr. Vladimir Djuric to whom she had

8

been referred by Dr. Fearon.  (Tr. 336-338).  Patterson's chief complaints were lower and upper back pain, leg pain, and arm pain.  (Tr. 336).  Upon examination, Dr. Djuric observed that Patterson had a slow and cautious gait, but she was able to heel toe walk effectively.  (Tr. 337).  He noted a moderate restriction in her cervical and lumbar range of motion; diffuse tenderness to palpation throughout the cervical, thoracic, and lumbar areas; and point tenderness to palpation of the left sternocleidomastoid, bilateral pecs, upper trapezoid, wrist extensors, lumbosacral paraspinals, piriformis muscles, greater trochanteric area, and medial thighs.  (Tr. 337).  She had full range of motion of her shoulders and elbows, but had a mild limitation of left wrist flexion, extension and deviation and tenderness over the CMC joint of the left thumb.  (Tr. 337).  Patterson had diffuse weakness which Dr. Djuric felt was due to Patterson's deconditioning; however, she had no focal motor deficits.  (Tr. 337).  Dr. Djuric opined that Patterson's clinical presentation was consistent with fibromyalgia, although she likely has some underlying spinal dysfunction involving the mid thoracic and lumbosacral areas that appear secondary to the fibromyalgia.  (Tr. 337).  Dr. Djuric suggested Patterson increase her use of Neurontin and alternate Darovocet with Ultracet.  He also recommended a graduated exercise program to improve her mobility, flexibility, and endurance.  (Tr. 337-338).

On March 6, 2003, Patterson presented to Dr. Djuric for follow up.  Patterson reported that she was feeling "much better," a 75% improvement, which she attributed to a heart catherization and the placement of two stents.  (Tr. 409).  She reported that since then, she had "considerably less pain" in her left shoulder and arm.  (Tr. 409).  Dr. Djuric observed that Patterson seemed very comfortable in sitting and ambulated with a

symmetric gait.  She had minor difficulty transferring from sitting to standing.  (Tr. 409).

Dr. Djuric noted that Patterson was not ready to stop smoking, despite the adverse

effects on her long-term health.  (Tr. 409).  Dr. Djuric advised Dr. Fearon that he did not

find any reasons to continue treating Patterson.  (Tr. 409).

Medical records from Dr. Fearon from May 12, 2003 through May 7, 2004

indicate complaints of back pain with radiation down the leg (Tr. 477-478), shakiness,

(Tr. 478) fatigue, (Tr. 488) and increased shortness of breath (Tr. 488).  Examinations

revealed minor paraspinal lumbar reactivity with spasm (Tr. 477), positive fibromyalgia

tender points (Tr. 481, 499), wheezing (Tr. 485), and diminished breath sounds (Tr.

485).  Diagnoses included herniated disc with radiation, (Tr.478), fibromyalgia, (Tr. 487)

and asthma (Tr. 476, 481, 485, 486, 494).

On  February 17, 2004, Patterson underwent pulmonary function testing; the

results were normal.  (Tr. 482).  On April 13, 2004, Patterson underwent an MRI of her

lumbar spine that revealed disc herniation at L5-S1 causing mild canal stenosis,

foraminal stenosis due to facet hypertrophy, and end plate degenerative changes.  (Tr.

508).

On June 15, 2004, Patterson presented for a physical therapy evaluation.  (Tr.

749).  The evaluation revealed decreased lower extremity strength, decreased trunk

active range of motion, and increased low back and leg pain.  (Tr. 749).  Patterson

attended nine physical therapy sessions and six aquatic therapy sessions.  Upon

discharge, Patterson had 75% range of motion in her forward/backward bending,

right/left rotation, and side bending bilaterally.  She had 4/5 strength in her hip flexion

bilaterally and knee extension/flexion, and 5/5 strength in her dorsiflexion.  (Tr. 742).

10

On October 21, 2004, Patterson presented to Michael Knapic, D.O. for follow up for her back.  Patterson reported that she had finished physical therapy and was doing home exercises.  She occasionally used anti-inflammatories.  Overall, she was pleased with her progress and felt well.  Dr. Knapic diagnosed resolving low back pain.  (Tr. 732).

Medical records from Dr. Fearon from May 24, 2004 through October 21, 2004 revealed diffuse palpatory pain/positive trigger points and positive impingement sign on the right shoulder.  (Tr. 531).  Dr Fearon diagnosed radiculopathy/osteoarthritic pain (Tr. 532, 548), fibromyalgia (Tr. 533), depression (Tr. 535), anxiety (Tr. 532, 548), asthma/allergies (Tr. 535), and lower extremity edema (Tr. 548).

Lab work performed on August 23, 2004 revealed an elevated C-reactive protein at 5.3 and an elevated sedimentation rate.  (Tr. 537-538).  X-rays taken the same day revealed mild degenerative changes of the left shoulder, degenerative changes of the thoracic spine, minimal degenerative changes of the right hand/wrist, and moderate degenerative changes of the cervical spine.  (Tr. 538-542).

On January 13, 2005, Patterson presented to Dr. Fearon for follow up.  Dr Fearon expressed concern that Patterson was exhausting herself by babysitting for her grandchildren.  She also noted that Patterson was not compliant with Dr. Patterson's recommendation to exercise, although Dr. Fearon noted that Patterson does suffer from asthma.  Examination revealed 16 of 18 tender fibromyalgia trigger points.  (Tr.  658).

On April 6, 2005, Patterson presented to Dr. Fearon for follow up.  Dr. Fearon noted 16 of 18 tender fibromyalgia trigger points.  (Tr. 656).

On July 7, 2005, Dr. Fearon noted that all of Patterson's fibromyalgia trigger

points were tender.  (Tr.  654).

On September 29, 2005, Patterson was evaluated for physical therapy for treatment of right shoulder and neck pain.  (Tr. 596).  Upon examination, Patterson had decreased range of motion of the cervical spine and right shoulder and tenderness to palpation.  Her right hand grip strength was 27 pounds and her left hand grip strength was 25 pounds.  (Tr. 596).  Patterson was diagnosed with fibromyalgia and acute trapezius and latissimus dorsi tightness.  (Tr. 597).  Patterson attended seven physical therapy sessions and reported that the therapy did decrease her pain.  (Tr. 598).

On October 5, 2005, Patterson presented to Rodney Miller, M.D. to whom she was referred for shoulder pain.  (Tr. 570).  Patterson continued to treat with Dr. Miller through January 2006.  (Tr. 570-576).  Examination revealed, among other things, trigger point tenderness throughout Patterson's spine consistent with fibromyalgia.  (Tr. 570).  Dr. Miller's initial assessment was right shoulder sprain/strain, probable rotator cuff tendonitis with mild impingement, right elbow lateral epicondylitis, possible radiculopathy or referred pain, fibromyalgia, and rule out polymyalgic rheumatic treatment.  (Tr. 570).  After an x-ray of the cervical spine, Patterson was diagnosed with cervical spondylosis, shoulder pain related to either tendonitis or cervical spondylosis, and possibly polymyalgia rheumatica. (Tr. 572, 575, 576).  She was advised to continue with physical therapy.  (Tr. 570).

An October 19, 2005, examination revealed that Patterson had good range of motion of the cervical spine with mild pain at the right trapezius.  Patterson had a positive Spurling's sign with pain going into the right trapezius and down the arm.  (Tr. 572).  An MRI of the cervical spine taken October 20, 2005, revealed moderate

12

degenerative change at C6-7 and C5-6.  (Tr. 579-580).  A November 4, 2005  EMG indicated possible T6-7 radiculopathy.  (Tr. 578).  A November 4, 2005 nerve conduction test suggested mild carpal tunnel syndrome on the right.  (Tr. 577).  On November 22, 2005, Patterson received a cortisone injection which did provide some benefit.  (Tr. 575-576).  On January 12, 2006, Dr. Miller advised Patterson to continue home exercises and to see him on an as needed basis.  (Tr. 576).

On December 19, 2005, Patterson presented to Dr. Fearon for follow up.  Dr. Fearon noted 16 of 18 positive fibromyalgia trigger points.  (Tr. 647).

On April 21, 2006, Patterson presented to Dr. Fearon for follow up.  Dr. Fearon noted tenderness in 18 of 18 fibromyalgia trigger points.  (Tr. 643).

On September 26, 2006, Dr. Sam N. Ghoubrial performed a consultive examination at the request of the state agency.  (Tr. 608-620).  Patterson reported that she was unable to work due to chronic fatigue and chronic pain caused by fibromyalgia, and that she had chronic pain in her shoulders, upper back, hips and knees.  (Tr. 608).  Upon examination, Dr. Ghoubrial noted extreme tenderness over all fibromyalgia trigger points; shoulders, hips, and knees bilaterally.  (Tr. 611).  He further noted Patterson's grasp, manipulation, pinch, and fine coordination were normal, as was her muscle strength in her upper and lower extremities, bilaterally.  (Tr. 613).  Patterson had a moderate decreased range of motion of the lumbar spine, mild decreased range of motion of the shoulders bilaterally, and mild degenerative changes to her hands.  (Tr. 610-611).  Dr. Ghoubrial opined that Patterson would have no problem sitting, walking, or handling objects.  (Tr. 612).  She had unlimited ability to reach, handle, fingering, and feel.  (Tr. 619).  She was limited to lifting 20 pounds occasionally and 10 pounds

13

frequently.  She could occasionally climb, balance, kneel, crouch, crawl, and stoop.  (Tr. 617-618).

On February 1, 2007, Patterson presented to Carlos Zevallos, D.O. for evaluation of hand pain.  Dr. Zevallos noted bilateral squaring of the first CMC's with the left side being worse than the right.  Patterson had full range of motion and normal strength of her upper and lower extremities. She had numerous tender points to palpation in the suboccipital areas, bilateral sternocleidomastoid, trapezius, supraspinatus areas, lumbar areas, greater trochanteric bursae, anserine, bursae, costochondral area, and lateral epicondyles.  Dr. Zevallos administered  an injection to the first CMC of Patterson's left hand.  He advised physical and occupational therapy and told Patterson to return for follow up in three months. (Tr. 722).

On February 16, 2007, Patterson presented for a physical therapy evaluation for her recent diagnosis of bilateral hand arthritis.  Patterson reported that other than driving, she was able to perform all activities of daily living, but it took much longer than usual.  (Tr. 683).  The therapist found Patterson's range of motion for both hands was within normal range; however opposition to all fingers was painful.  Patterson was prescribed wrist splints.  (Tr. 683).

On May 23, 2007, Dr. Fearon completed a medical source statement regarding Patterson's mental status.  (Tr. 714-715).  Dr. Fearon rated Patterson's ability as good or very good in most areas.  She rated Patterson as having fair ability to maintain regular attendance and be punctual within customary tolerances, and in dealing with work stress.  (Tr. 714-715).  She rated Patterson as having poor or no ability to complete a normal workday or work week without interruptions from psychologically

14

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods due to fibromyalgia.  (Tr. 715).

On the same day, Dr. Fearon completed a physical residual functional capacity form.  (Tr. 716-717).  Dr. Fearon opined that Patterson was limited to lifting two pounds occasionally due to asthma.  She could stand/walk for one hour out of an eight hour workday due to chronic pain from fibromyalgia and severe asthma.  She could sit for four hours out of an eight hour workday due to stiffness and achiness from sitting too long and debilitating exhaustion with a full day.  (Tr. 716).  Patterson had poor to no ability to climb, balance, stoop, crouch, kneel, crawl, push, or pull.  She was limited in her ability to work around heights, temperature extremes, chemicals, dust, noise, and fumes.  She required a sit/stand option and needed frequent breaks.  (Tr. 716-717).

On March 30, 2007, Patterson underwent pulmonary function testing.  The results were normal.  (Tr. 695).

### C.  Hearing Testimony

At the first hearing, Patterson testified that she could not work due to her allergies and asthma, fibromyalgia, twitching in her arms and legs, and fatigue.  (Tr. (790-792).  She has tremors that are worsening.  (Tr. 793).  She has back pain that radiates into her hips.  (Tr. 791).  She stated that she can stand/walk for 10 to 15 minutes.  (Tr. 794).  She can lift a half gallon of milk.  (Tr. 794).  She quilts, crochets, and sews, but some days she cannot due to problems with her hands.  (Tr. 799).  She cooks and cleans with difficulty.  (Tr. 803).

The ALJ asked the VE to consider an individual who:  (1) was limited to occasionally lifting five to 10 pounds; (2) could stand and or walk for up to 30 minutes at

15

a time to a total of two hours in an eight hour workday; (3) would require additional rest in addition to a morning break, lunch break, and afternoon break; (4) could rarely climb, stoop, crouch, kneel, crawl, push, pull, handle, or engage in fine or gross manipulation; (5) could occasionally balance; (6) could frequently feel; and (7) who would be limited from exposure to chemicals, dust, noise, and fumes.  (Tr. 811).   The VE testified that such an individual would not be able to work.  (Tr. 811).

The ALJ then asked the VE to consider an individual who: (1) could stand/walk for no more than 15 minutes at a time to a total of two hours in an eight hour workday; (2) could lift less than five pounds occasionally; and (3) could sit for 20 minutes at a time to a total of no more than 2 hours in an eight hour workday.  The VE testified that such an individual could not work.  (Tr. 812).

At the second hearing, Patterson testified that she has arthritis in her neck and hands, fibromyalgia, low back problems, asthma, recurrent infections, anxiety, and depression.  (Tr. 820).  She has difficulty lifting and holding on to objects.  (Tr. 822).  She has difficulty lifting and pouring a gallon of milk.  (Tr. 822).  She has difficulty quilting and embroidering   (Tr. 822).  She can walk a half a block before her legs get tired and shaky.  She can stand for five to 10 minutes and can sit for 15 minutes.  (Tr. 826-827).  Most nights she has difficulty sleeping due to her legs shaking.  (Tr. 827).  She does not drive a car due to shoulder and arm pain.  (Tr. 827).  She cleans her house and does her laundry.  She goes shopping with help and attends church.  (Tr. 828).  Patterson testified that she takes Neurontin, Darvoct, Prilosec, Cardizem, Loratadine, Flexeril, Singulair, Zentia, Serevent, Flovent, Nasonex, Astelin, and Maxair, and uses inhalers.  (Tr. 826).

David Garling, M.D., medical expert, testified that Patterson had no limitations with sitting, walking, or standing.  She could lift 35 pounds occasionally, and 20 pounds frequently.  (Tr. 834).  She had no limitations using her hands.  She could frequently bend, squat, crouch, climb stairs, and reach above shoulder level.  She should avoid temperature extremes and pollutants.  (Tr. 834-835).

Dr. Garling testified that Patterson's fibromyalgia diagnosis was not well documented.  (Tr. 837).  He further testified that fibromyalgia is episodic and there are specific trigger points of fibromyalgia.  He stated that he did not see that either of those criteria were well documented in the record.  (Tr. 838).  Dr. Garling also testified that one of the most appropriate treatments for fibromyalgia is increased physical activity and exercise, and that only in the rarest cases is fibromyalgia itself so incapacitating as to be a source for impairment.  (Tr. 837).

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently

17

engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ made the following findings:

> 1. The claimant has not engaged in substantial gainful activity since October 29, 2001, the alleged application date.
>
> 2. The claimant has the following severe impairments: degenerative disc disease of the lumbosacral spine, sleep apnea, herniated nucleus pulposus at L5-S1 with some nerve root compression, asthma, chronic bronchitis, and osteoarthritis. (20 CFR § 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P. Appendix 1....
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry 35 pounds occasionally and 20 pounds frequently; no limitations on standing, walking, sitting, pushing/pulling, using foot controls, fine manipulation, can perform simple grasping, and repetitive work, can frequently bend, squat,

18

stoop, crouch, climb ladders/stairs, and reach above the shoulder level; but should avoid temperature extremes and pollutants.

5. The claimant has no past relevant work (20 CFR § 416.965).

6. The claimant was born on September 9, 1953 and was 44 [sic] years old, which is defined as a younger individual age 18-49, on the date the application was filed....

7. The claimant has a high school education and is able to communicate in English....

8. Transferability of job skills is not an issue because the claimant does not have past relevant work....

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform ....

10. The claimant was not under a disability, as defined in the Social Security Act, since October 29, 2001, the date the application was filed (20 CFR § 416.920(g)).

(Tr. 21,24,29).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  See Elam v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be

19

somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Patterson alleges that the ALJ erred by: (1) determining that plaintiff's fibromyalgia and mental health impairments were not severe; and (2) failing to give substantial weight to the opinions of Patterson's treating physicians. The Commissioner disputes these claims.

### A.  Findings Regarding Severity of Impairments

At step two of the disability determination, the claimant must establish that he suffers from a severe impairment.  20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d). In the instant case, the ALJ determined that Patterson suffered from several severe impairments; however, he did not include among them, Patterson's fibromyalgia and mental health issues.  Patterson alleges that the ALJ erred by failing to include her fibromyalgia and mental health issues as severe impairments.  The Court agrees that the ALJ erred in his treatment of Patterson's fibromyalgia, but for different reasons.

Once an ALJ determines that a claimant has one or more severe impairments the ALJ must consider the limitations and restrictions imposed by all of the claimant's impairments whether severe or not.  Provided the ALJ considers all of the claimant's impairments in the remaining steps of the disability determination, the ALJ's failure to find a particular impairment severe at step two of the disability determination does not constitute reversible error.  *Fisk v. Comm'r of Soc. Sec.*, 253 Fed. Appx. 580, 2007 WL 3325869 (C.A.6 Ohio)); *Nejat v. Comm'r Soc. Sec.* 2009 WL 49816886 (C.A.6 (Tenn.)). In this case, as discussed below, the ALJ failed to consider the limitations imposed by

Patterson's fibromyalgia, not only at step 2, but also in the remaining steps of his evaluation.

The record is replete with objective evidence that supports Patterson's diagnosis of fibromyalgia.  This evidence includes numerous findings of positive trigger points by at least four doctors beginning in 2000 and continuing through the time of the hearing. It also includes evidence of ruling out other possible conditions through objective medical analysis.[2]   However, despite the overwhelming evidence, the ALJ did not consider any restrictions imposed by Patterson's fibromyalgia, but instead relied exclusively on the testimony of the medical examiner who erroneously concluded that Patterson's fibromyalgia was not well documented.  The ALJ's failure to consider the limitations  imposed by Patterson's fibromyalgia constitutes reversible error.  Therefore, his decision must be vacated.

However, unlike Patterson's fibromyalgia, the ALJ did consider the limitations imposed by Patterson's anxiety and depression.  (Tr. 27).  Therefore, his failure to designate these impairments as severe does not constitute reversible error.

**B.  Treatment of Medical Opinions**

**1. *Dr. Fearon's Opinions***

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs., 708 F.2d 1048 (6th Cir. 1983)*.  Medical opinions are statements about

---

[2] The process of diagnosing fibromyalgia includes the testing of a series of focal points for tenderness and the ruling out of other possible conditions.  *Preston v. Sec'y of Health & Human Servs., 854 F. 2d 815 (6th Cir. 1988)*; *Swain v. Comm'r of Soc. Sec., 297 F. Supp. 2d 986 (N.D. Ohio 2003)*.

the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991)*; *Sizemore v. Secretary of Health and Human Services, 865 F.2d 709, 711-12 (6th Cir. 1988)*.  Where there is insufficient objective data supporting the treating physician's opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs., 803 F.2d 211, 212 (6th Cir. 1986)*.  The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight.  *Shelman v. Heckler, 821 F.2d 316 (6th Cir. 1987)*.

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *4.

When the adjudicator determines that the treating source's opinion is not entitled

to controlling weight, he is required to articulate good reasons for the weight given to the treating source's medical opinion.  20 C.F.R. §§ 404.1527(d) (2) and 416.927.

> [T]he ...decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *5.

In this case, the ALJ's stated reasons for rejecting Dr. Fearon's opinions are insufficient and constitute reversible error.  The ALJ finds that Dr. Fearon's opinions are inconsistent with the greater weight of the evidence and appear to be based primarily on the subjective reports of the claimant.  However, the ALJ fails to adequately articulate the inconsistencies to which he refers or explain how the inconsistencies undermine Dr. Fearon's opinion.  Moreover, Dr. Fearon's records do contain objective examination results.  The ALJ's finding that Dr. Fearon's opinions are based on the claimant's subjective complaints is an overly broad and conclusory finding.  Rather than articulate his reasons for rejecting Dr. Fearon's opinions, the ALJ merely accepts the conclusory findings and opinions of Dr. Garling, the ME.  The ALJ is required to do more.

Moreover, while the Commissioner, in his brief, provides a review of the medical evidence and concludes it supports the ALJ's findings, the ALJ did not do the same. Therefore, such a recitation is purely conjecture upon the part of counsel and cannot serve as the basis for review by a court.  *See Watford v. Massanari*, No. 1:00 CV 00004, p. 13 (N.D. Ohio April 24, 2001); *see also National Labor Relations Board v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 715 n.1 (2001) (counsel's *post hoc*

23

rationalizations are not substituted for the reasons supplied by the administration); *Securities and Exchange Comm'n v. Federal Water & Gas Corp.*, 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."); *Municipal Resale Serv. Customers v. Federal Energy Regulatory Comm'n*, 43 F.3d 1046, 1052 (6th Cir. 1995) (same); *Amoco Prod. Co. v. National Labor Relations Bd.*, 613 F.2d 107, 111 (5th Cir. 1980) (same and citing cases); *Sparks v. Bowen*, 807 F.2d 616, 617 (7th Cir. 1986) (in social security review, court must evaluate the reasons set forth by the ALJ).

The ALJ's failure to fully articulate his reasoning deprives this Court of the ability to conduct any meaningful review.  See *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004) (finding it was not harmless error for the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion). Therefore, his opinion must be vacated.

24

**2. *Dr. Campbell's Opinion***

Only acceptable medical sources can be considered treating sources whose medical opinions may be entitled to controlling weight. Social Security Ruling 06-03p, 2006 WL 2329939 *2.  A chiropractor is not an acceptable medical source; and therefore, his opinion is not entitled to controlling weight.  Social Security Ruling 06-03p, 2006 WL 2329939 *2.  However, opinions from other medical sources are, "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Social Security Regulation 06-03P, 2006 WL 2329939 *3.

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain ...the adjudicator generally should explain the weight given to opinions from these "other sources" or otherwise ensure that the decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an affect on the outcome of the case.

Social Security Regulation 06-03P, 2006 WL 2329939 *6.

There is no question that Dr. Campbell's opinion may affect the outcome of this case.  However, in rejecting Dr. Campbell's opinion, the ALJ did not provide any rationale beyond his conclusory statement that Dr. Campbell's opinion is inconsistent with the objective medical evidence and appears to be based solely on Patterson's subjective performance.  This rationale deprives the Court of the ability to engage in any meaningful review regarding an issue that may impact the outcome of this case.  Accordingly, consistent with  Social Security Regulation 06-03P, 2006 WL 2329939, the ALJ should have provided a more complete explanation for his decision to reject Dr.

25

Campbell's opinion.

### VII.  Decision

For the foregoing reasons, the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision of the Commissioner is VACATED and the case REMANDED for further proceedings consistent with this Memorandum Opinion and Order.


IT IS SO ORDERED                                    /s/ Nancy A. Vecchiarelli_____
                                                             U.S. Magistrate Judge


Date: June 2, 2010

26